## ESTATE OF WELLS TOMLINSON, DECEASED.

### APPEAL BY W. TOMLINSON, JR., ET AL., FROM THE ORPHANS' COURT OF MONTGOMERY COUNTY.

Argued February 7, 1890—Decided March 17, 1890.<br>[To be reported.]

1. As respects the validity of a will, writing and signature with a lead pencil are the full equivalent for a writing in ink. The instrument has precisely the same legal effect in either case, all legal distinction between the two kinds of writing being obliterated in this state: Myers v. Vanderbelt, 84 Pa. 510.

2. Alterations in a will made by the testator with a lead pencil, signify the same intent and have the same effect as if they were in ink; and from the fact that the alterations are in pencil upon a will written in ink, no presumption arises that they are deliberative only and do not express the final intent of the testator.

(a) A will was found, after the testator's death, among some papers of no value, in a locked drawer of a bureau standing in the room wherein he died. Shortly before he died, the testator handed to a relative a bunch of keys, one of which unlocked the drawer, with instructions to deliver them to his executor as soon as he was dead.

(b) The will was written and signed in ink. When found, certain of the bequests in it were canceled by pencil lines drawn across and through them. This had been done after its execution, but when and in what

Statement of Facts.

circumstances no witness knew.   The circumstances all indicated, how-
ever, that these marks were made by the testator himself.

(c) In a box of the testator at a bank was found a list of the legatees
named in the will and the amounts bequeathed to them.   The names of
all whose bequests were canceled in the will were likewise canceled on
this list, together with the amounts set opposite them.   One other name
was canceled on the list, but not the corresponding amount.

(d) The will directed the residuum of the estate to be divided among the
legatees named in it, and it was admitted to probate in the condition in
which it was found.   Upon distribution in the Orphans' Court, the per-
sons whose bequests were canceled in the will claimed payment thereof
and claimed also shares of the residuum :

3. The circumstances above stated raised no inference that the testator
did not intend what he in fact did, viz., to cancel the legacies crossed
over; the will could be given effect only in the condition in which it
was found, and the persons named in the canceled bequests were en-
titled to nothing thereunder or under the residuary clause.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILL-
IAMS, MCCOLLUM and MITCHELL, JJ.

No. 137 January Term 1890, Sup. Ct.; court below, num-
ber and term not given.

S. M. Dutton and Abraham Wentz, executors of the last
will and testament of Wells Tomlinson, deceased, having filed
an account of their trust exhibiting a balance in their hands
for distribution, and the same having been duly confirmed, the
court below appointed *Mr. Charles H. Stinson* auditor, to report
a distribution of said balance.   The auditor found the follow-
ing facts :

Wells Tomlinson, the decedent, died on January 21, 1887,
having made his last will and testament of date January 31,
1883.   On November 1, 1887, said will was admitted to pro-
bate, and letters testamentary were duly issued to the executors
therein named, the present accountants.

The will was written for the testator on January 31, 1883,
by S. M. Dutton, one of the executors, and on that day it was
signed by the testator in Dutton's presence.   It was subse-
quently acknowledged as his will by the testator in the pres-
ence of William Crawford and John Macombs, who subscribed
it as witnesses.   The will was written in ink.   It bequeathed
a large number of legacies, the legatees named being all neph-
ews, nieces, grandnephews or grandnieces of the testator.

### Statement of Facts.

The word "Item," written upon the margin of the paper, was prefixed to each bequest. At the time the testator signed it, and at the time it was witnessed by Crawford and Macombs, there were no marks of cancellation on any part of the paper.

Before his death, the testator handed to his niece, Anna Cressman, who lived with him, a bunch of keys, directing her to give them, as soon as he was dead, to the executor, Dutton. One of these keys unlocked a bureau drawer in the testator's room. On the morning of the testator's decease, Dutton was handed the bunch of keys by Miss Cressman. After the funeral, Dutton unlocked the bureau drawer in the presence of his co-executor and other persons, and after searching found the will therein, among some papers of no particular import. At that time, seven of the bequests had pencil lines drawn through them. In each of these instances, a pencil cross appeared either to the right of or partly over the word "Item," and pencil lines were drawn horizontally across the paper through the body of the bequests ; in some places, a single line ; in others, two or more lines. In some instances, the lines passed over or under a word or two of the writing, instead of through it. All the bequests so lined over were legible, notwithstanding the pencil lines.

The will contained a bequest of $500 to John Keller, which was not among those through which pencil marks were drawn. By the residuary clause it was directed that the residue of the estate, if any, should be equally divided among the testator's "nieces and nephews and grand nieces and nephews, share and share alike, mentioned in this will."

Long after the probate of the will, the executors found in a box at the First National Bank of Norristown, in which the testator kept his valuable papers and securities, a paper in his handwriting, dated February 14, 1887, and headed, "Bequests made in my will." It contained the name of each legatee mentioned in the will, with the amount of each legacy, and a footing showing the aggregate of the legacies. Upon this paper the names of the seven legatees, whose bequests were marked with pencil lines in the will, were crossed over, as were also the amounts set opposite those names. The footing up of the amounts of the legacies stood unchanged. The name of John Keller was canceled upon the paper found in the bank,

but the amount opposite his name, $500, was not. The paper contained also some calculations, part of which were not in the testator's handwriting.

Upon these facts, the auditor reported his opinion as follows:

There is not a particle of doubt that these pencil marks and lines were made after the will was written, witnessed and signed by the testator, and there is nothing to excite even a suspicion that they were not the testator's own work. There has been no testimony outside of the will itself to explain how, when, or what influenced the testator to make them. The question is, therefore, what effect has these pencil marks and lines upon the will and bequests in the will, as written by Mr. Dutton and signed in his presence by the testator. Are the original bequests good and valid, notwithstanding the crossing them out in pencil, but leaving distinct the writing under the pencil lines, or by reason thereof, void?

The act of April 8, 1833, P. L. 250, §§ 13, 14, relating to how wills may be revoked, is that no will in writing concerning any personal estate shall be repealed, nor shall any bequest or direction therein be altered, "otherwise than by some other will or codicil in writing, or other writing declaring the same, . . . . . or by burning, canceling, or obliterating or destroying the same by the testator himself, or by some one in his presence and by his express direction." In this case, there was no other will or codicil, and if there was a cancellation or obliteration of these bequests, it must be so held under one or the other of these designations.

It cannot be held that the cancellation or obliteration, if such it be, of these bequests, operated as revoking the entire will, but if a revocation, it had only that effect upon the particular bequests themselves. A revocation by obliteration may be either partial or total; when a pen is drawn over part of the will only, a revocation is effected pro tanto and the unobliterated portions remain in force: Jarman on Wills, 291. In Cook's Est., 5 Clark 1, the court cites Roberts v. Round, 3 Hagg. 552, which held that when the first part of a will had been mutilated, and different parts cut out, Sir John Nicholl, carrying out the principle, says: "This mutilation of the first part, leaving the signature untouched, would not be a total

revocation; it would be a revocation of these parts of the devises only." It is, therefore, apparent from the authorities, that the cancellation or obliteration made in this case, if effectual, can only be so upon the particular bequests through which the pencil lines are drawn, and opposite to which crosses have been made over the words "Item" on the margin of the paper.

That a testator can revoke his will by canceling or obliterating his name by drawing a line through his name at the end of his will, without more, has been decided: Baptist Church v. Robbarts, 2 Pa. 110; Evans's App., 58 Pa. 238. In these cases, however, the will was written in ink, and the obliteration or cancellation was done by drawing ink lines across the same. If, therefore, the whole will can be canceled in this manner, it would seem to follow that parts of it can be done in a similar way, by drawing ink lines across any bequests made. In the present case, the marks and lines were made by pencil, and not in ink. What difference in effect, if any, has a canceling by a pencil and by a pen?

WILLIAMS, J., in Patterson v. English, 71 Pa. 454, declined to decide " whether under our statute relating to wills, a paper purporting to be testamentary, written and signed with lead pencil is a valid will," saying, "it will be time enough to determine this question when its decision becomes necessary." This necessity arose in Myers v. Vanderbelt, 84 Pa. 510, when MERCUR, J., decided that " a will written and signed with lead pencil is 'a writing' within the meaning of the act of April 8, 1833, and is a valid will." Also, Evans's App., 58 Pa. 238; Fuguet's Will, 11 Phila. 75. We, therefore, have it decided that a will signed in pencil is as valid as if signed in ink, and does away with the idea that a will must be written with any particular material or composition. If, therefore, a codicil was executed in pencil and proved according to the statute, canceling certain bequests in a will, it would have the effect of revoking the bequests originally made therein, because it is one of the ways pointed out by the statute to do so. And if it is held that an ink line drawn across a particular bequest will revoke the bequest, it would seem clear that a pencil line obliterating the bequest would have the same effect, when done with the intention of revoking it.

It is laid down in the text books, Williams on Executors, 63 and 111 ; Jarman on Wills, 291 ; Greenleaf's Evidence, 595, that if an alteration or obliteration is in pencil it may be final, or it may be deliberative. Our own decisions seem to have abolished the distinction between a pen and pencil, and therefore, whether a revocation is intended as final or deliberative, must depend upon the intention of the testator. In this case, there is nothing outside of the will itself, as produced after his death and now of record, to explain these marks and lines. The testator clearly intended something by making a cross over the "Items" in the margin, and running his pencil several times through the bequests. What was his intention in so doing ? The only evidence to determine this intention is the will itself. The paper " C. H. S.," found long after the probate of the will, in his box with his securities, part of which is in the handwriting of the testator, if it throws any light upon the question, is rather confirmatory of his intention that he had canceled these bequests. . . . . . The only inference to be drawn from it is, that he was counting up his estate and that he had already canceled these bequests, or might have done so about this date. In either event there is nothing to show that the testator did not consider the will, as now found, as not his final disposition of his estate.

In Williams on Executors, 127, it is said, if a testament was in the custody of the testator, and upon his death it is found among his repositories mutilated or defaced, the testator himself is to be presumed to have done the act, and the law presumes that he did it animo revocandi. In 4 Kent's Com., 531, if the will be found canceled, the law infers an intentional revocation, for it is prima facie evidence of it and the inference stands good until it is rebutted. "A paper purporting to be testamentary being found with the signature obliterated, the presumption is it was obliterated by the testator ; without evidence, the legal inference is that the testator did it himself : " Baptist Church v. Robbarts, supra. Cancellation of a will means any act done to it which in common understanding is regarded as cancellation when done to any other instrument. It must be an act done to the will itself, animo cancellandi : Evans's Appeal, supra. Upon a full consideration of the facts and the law governing the case, the conclusion is inevitable,

that it was the intention of the testator to cancel these bequests, and that he carried out such intention by marking on the margin, and drawing his pencil several times through entire bequests, as originally written.

There is one more question to be decided. It is contended that even if the bequests were canceled, still the legatees named are entitled to participate in the distribution under the residuary clause, which directs that the balance of the estate, if any, be equally divided between his nieces and nephews and grandnieces and nephews, share and share alike, mentioned in the will. All the legatees named in the will bear this relation to the testator. Had he never written the names crossed out, the residue would still be distributable to the relations named, so that the description is equally applicable to the remaining legatees; and, having made the bequests void by canceling them, it has the same effect as though they never had been named. It is therefore concluded that they are not entitled to participate in the distribution of the residue. To do so would in effect recognize them as legatees "mentioned in the will."

The auditor accordingly reported a distribution from which the persons named in the bequests crossed over in the will were excluded. Exceptions having been filed to his report, the court, SWARTZ, P. J., filed an opinion, which after describing the condition of the will, when admitted to probate, proceeded:

Did the testator revoke the legacies so lined in pencil?

The auditor finds that the only evidence of the testator's intention as to these pencil lines is the paper itself; that "there is nothing outside of the will itself, as produced after his death and now of record, to explain these marks and lines."

Does a pencil line drawn through a bequest, without any explanation as to the testator's intent, revoke such legacy?

Where such lines are found upon the will, under the circumstances in this case, the presumption is that they were made by the testator himself: Baptist Church v. Robbarts, 2 Pa. 110. The auditor so finds the fact.

A will is valid if written and signed in lead pencil, and from this the learned auditor seems to conclude that a lead-pencil line drawn through a bequest by the testator of necessity revokes such legacy. It is undoubtedly true that a legacy may

Opinion of Court below.

be revoked by lead pencil, when it is manifest that the intent of the testator to revoke existed, but it does not follow that the mere making of such lines establishes such intent or shows an execution of such intent. Where a will is drawn and executed in pencil, the intent is manifest, the paper speaks for itself. The question of intent does not arise. As was said in Myers v. Vanderbelt, 84 Pa. 513 : " Such a case presents the single question, whether an instrument written and signed in lead pencil may be a valid will." It is a question of validity, not of intent. But where pencil lines are drawn through a legacy, the all important question arises, Was there an intent to revoke, and was this intent executed ?

What is the usual and ordinary signification of such an act ? In the case before us, the will was carefully prepared under the direction of the testator and duly executed in the presence of witnesses. After a time he takes the paper, carelessly draws lead pencil lines through some of the legacies, and then casts it aside among some useless papers. Does this ordinarily indicate anything more than an intent to reconstruct his will ? Do these lead pencil marks indicate anything more than mere memoranda to aid the testator in the reconstruction of his will, as soon as his mind is fully prepared for this act ? We think this is the usual and ordinary signification of such an act, and we are bound to give it that interpretation.

The leading text-book authorities upon this subject so interpret these acts. They hold that " lead pencil lines drawn through a legacy by the testator raise no presumption of revocation ; that this is but a deliberative act indicative of some future incomplete purpose : " Redfield on Wills, 307. " Where pencil is used instead of pen, it is always prima facie deliberative : " 1 Jarman on Wills, 291. " The general presumption and probability are, that where alterations in pencil only are made, they are deliberative ; where in ink, they are final and absolute : " 1 Williams on Executors, ed. 1877, 111.

The principle laid down by these writers is sustained by the English authorities, and these should be of great weight with us, because the thirteenth section of the act of April 8, 1833, relating to wills, is substantially the same as the 29 Charles II, ch. 3, § 6.

The case of Francis v. Grover, 5 Hare 38 (26 Eng. Ch. 38),

Opinion of Court below.

is directly in point. The legacy of Margaret Evans had a lead pencil line drawn through the bequest. The court said: "The learned judges have all considered that a pencil alteration may be final, or that it may be deliberative, and that from the nature of the act they consider it prima facie as deliberative and not final." In support of this proposition the court cited Hawkins v. Hawkins, 1 Hagg. 322; Edwards v. Astley, 1 Hagg. 491; Ravencroft v. Hunter, 2 Hagg. 68; Parkins v. Bainbridge, 3 Phill. 321. In Fuguet's Will, 11 Phila. 75, Judge HANNA recognized the same principle. He says: "The presumption that the erasures in lead pencil were deliberative only, we think is overcome by the testator's declarations at the time, coupled with the surrounding facts and circumstances."

Thus far we have considered the case upon the finding of the learned auditor, that there are no surrounding facts and circumstances to explain the intent of the testator in making these pencil marks and lines. We think the auditor should have found that there are surrounding facts which strengthen the presumption that the acts of the testator were deliberative only. The care exercised originally in the preparation of the will; the careless manner in which the pencil lines were drawn, some words in the legacy escaping the pencil entirely; the cutting of the paper in drawing the pencil line, and placing the instrument in a drawer with other worthless matter, while his valuable papers were carefully kept in a box at bank, are all facts indicating to my mind that the testator's acts were deliberative only. He intended to use this penciled, cast-off paper to aid him in having a new will drawn, as soon as his mind should be fully made up and prepared to execute such new will.

That he was still vacillating is shown by the production of the memorandum found in his bank box. This paper contained all the names of his legatees as originally designated in his will. Some were crossed in pencil, and among those so crossed was that of John Keller, whose name now stands in the will probated without any attempt at cancellation.

The paper writing, executed by Mr. Tomlinson in the presence of two witnesses, at that time clearly declared the intentions which he willed to be performed after his death, and that declaration should stand until it is clearly made to appear

Arguments.

that its provisions were in whole or in part revoked.   To hold
that the mere existence of lead-pencil lines drawn through a
legacy revokes such bequest, is to remove one of the safeguards
thrown around a testator's solemn declaration; a safeguard
approved by the experience of many years and found neces-
sary to secure protection for a man's last will and testament.

In our judgment and understanding both reason and legal
authority declare that the drawing of the pencil lines was a
deliberative act.   To hold that this act is prima facie evidence
of a finality, is in conflict with these authorities, and we think
against the policy of the law.

And now July 1, 1889, the exceptions are sustained, and
the report is referred back to the auditor for the purpose of
making a re-distribution in accordance with this opinion.

In compliance with the directions of the court, the auditor
reported a schedule of distribution among the legatees named
in the will, including those excluded from his former distribu-
tion.   Exceptions to the second report of the auditor filed by
Wells Tomlinson and others, residuary legatees, were dis-
missed by the court, and the distribution reported therein con-
firmed.   Thereupon the exceptants took this appeal, specifying
that the court erred, inter alia :

16. In not confirming the auditor's first report and decreeing
distribution in accordance therewith.

26. In confirming the second report of the auditor and de-
creeing distribution accordingly.

*Mr. Neville D. Tyson*, for the appellants:

1. In England it is held that lead-pencil erasures may be de-
liberative or they may be final, the question being one of fact,
to be determined from the character of the erasures or altera-
tions or from the surrounding facts and circumstances.   In
none of the cases cited by the court below, and in none that I
have found, has the .rule been laid down that they are prima
facie deliberative only.   The opinion of the court below revers-
ing the auditor is based upon a single sentence of the report,
to the effect that there is no evidence outside of the will itself
to explain the marks and lines, and this sentence is taken as if
it stood alone.   It should be considered in connection with the

Arguments.

remainder of the report, which contains the finding of a number of facts, and a further finding "based upon a full consideration of the facts and the law," that the testator intended to and did cancel these bequests. This finding is entitled to the same weight as the verdict of a jury.

2. It may very well be that the cancellations were made before the subscribing witnesses were called in, as the date of the paper found in the bank is very uncertain. The year may be deciphered as 1883, just as well as 1887, though the auditor has found it to be 1887. But, however that may be, it is clear that the testator first marked off from that paper the bequests he intended to cancel, and, guided by it, made the crosses on the word "Item" at the proper places in the will, and then, guided by these crosses, struck out the bequests. Doubtless his mind was vacillating at the time he was making the paper which he left in the bank, for at one moment he evidently intended to revoke the legacy to John Keller and went so far as partially to strike it from the list, but then changed his mind. He left that legacy unchanged in the will. There is no evidence of vacillation upon the face of the will. Had his marks there been deliberative only, he would have done no more than make the crosses on the margin.

3. Nor does the character of the papers among which the will was found show a lack of intention to cancel finally. Although they were of no account to the executors, having no money value to the estate, they were regarded by the testator as valuable to him, as is evidenced by the jealous care with which he guarded them and the will, which he concealed beneath them. The Wills Act of April 8, 1833, P. L. 249, is silent both as to the instrument or material with which a will may be written, and as to that with which the "canceling or obliterating," which it allows as a mode of revocation, may be done. A will written with a lead pencil is valid: Myers v. Vanderbelt, 84 Pa. 510. Pencil writing is equivalent to writing in ink: Hill v. Scott, 12 Pa. 168; City Insurance Co. v. Bricker, 91 Pa. 488. Therefore, an erasure or obliteration in pencil is just as effectual as if done with ink. This is the only consistent and logical result of the reasoning invoked in Myers v. Vanderbelt, supra.

4. A single line drawn through the writing is a sufficient

obliteration, though the writing be clearly legible beneath. Any physical act done to the will, which to the common understanding and usage amounts to an obliteration or cancellation, showing an intention to make the part so canceled void, is sufficient: Baptist Church v. Robbarts, 2 Pa. 110; Evans's App., 58 Pa. 238; Shipler's App., 3 Penny. 272; Fuguet's Will, 11 Phila. 75. A will may thus be revoked in part, without affecting the validity of the remaining parts: Wikoff's App., 15 Pa. 281; Rudy v. Ulrich, 69 Pa. 177; Linnard's App., 93 Pa. 313; Fuguet's Will, 11 Phila. 75. Publication of the alterations is unnecessary: Fuguet's Will, supra. The canceled clauses form no part of the testamentary paper as probated, and are to be treated as if they had never been in it: Linnard's App., supra. It is too clear for argument that the auditor was right in holding that the persons named in those clauses are not entitled to share in the distribution under the residuary clause.

*Mr. B. E. Chain* and *Mr. William F. Solly*, for the appellees:
1. A will is a sacred paper, which the law does not permit to be altered in any manner except in the mode prescribed by statute ; a belief by the testator that he has effected a revocation, or even his express declaration that he has done so, will not so operate, if the statutory forms be not followed: Shipler's App., 3 Penny. 272; Clingan v. Mitcheltree, 31 Pa. 25. The act of 29 Charles II, cap. 3, was in force in England when our act of April 8, 1833, P. L. 249, was passed. As the two acts are similar, the decisions then made under the English act would seem to control, and under those decisions pencil alterations are prima facie deliberative and not final, especially when the instrument as originally written is formal in its character: 1 Williams on Executors, ed. 1877, 111; 1 Jarman on Wills, 291; 1 Redfield on Wills, 307; 2 Greenleaf on Evidence, 622; Hawkes v. Hawkes, 1 Hagg. 322; Edwards v. Ashley, 1 Hagg. 490; Parker v. Bainbridge, 3 Phill. 321; Francis v. Grover, 5 Hare 38; Goods of Hall, L . R., 2 Prob. & Div. 256 ; Ravencroft v. Hunter, 2 Hagg. 68 ; Perkes v. Perkes, 3 B. & Ald. 489; Winson v. Pratt, 5 Moore 484. This rule is recognized in Fuguet's Will, 11 Phila. 75, and Baptist Church v. Robbarts, 2 Pa. 110.

Opinion of the Court.

2. There are various circumstances which strengthen the prima facie presumption in this case. The careful manner in which the will was originally prepared, and the careless manner of the cancellations; the fact that the will was found in a drawer among papers of no account, indicating it was thrown aside among old papers in contemplation of making another one; the failure to make any change in the footings on the paper found in the bank; the crossing over the word " Item" which was the equivalent of the word " query " as written in the case of Goods of Hall, supra; and the delivery not of a single key, but of two or three, are all evidence, under the authorities cited, of the absence of an intention that the pencil lines on the will should not be treated as final. The auditor does not appear to have considered these circumstances. He based his finding entirely on the assumption that the distinction between ink and pencil writing was abolished by Myers v. Vanderbelt, 84 Pa. 510. But it has been held in England, prior to the decisions we have cited, that a will written and signed in lead pencil was valid: Rymes v. Clarkson, 1 Phill. 35; Green v. Skipworth, 1 Phill. 53; Dickinson v. Dickinson, 2 Phill. 173; Goods of Dyer, 1 Hagg. 219; 1 Williams on Executors, 111.

OPINION, MR. JUSTICE GREEN:

The reasoning and the authorities cited in the opinion of this court in the case of Myers v. Vanderbelt, 84 Pa. 510, make it very clear that we intended to decide, and did decide, that the writing of a will in pencil is the full equivalent for a writing in ink. Mr. Justice MERCUR, in the course of the opinion, said: " So we think the authorities establish that a valid will may be drawn with the same materials that will suffice for the drawing of any written contract. As was well said by Mr. Justice COULTER in Hill v. Scott, supra (12 Pa. 169), they abundantly prove that a writing in pencil is equivalent and tantamount to a writing in ink." We there held that a will, the whole of which was written in lead pencil, was in compliance with the requirement of the Wills Act of April 8, 1833, that " every will shall be in writing." We are entirely satisfied with that decision, and have no disposition to change or modify it. The learned court below thought that, because the cancellation

was in pencil, while the will itself was in ink, the cancellation was deliberative only, and not final, and he therefore overruled the auditor, who held it to be final. In doing this the court followed a few English decisions, which, while agreeing that wills written in pencil are valid, yet hold that where alterations were made in pencil they would be regarded, if the will was in ink, as deliberative only. It would not be difficult, upon a review of those cases, to show that in most, if not all of them, the decision was based as well upon other facts and circumstances as upon the fact of the alterations being in pencil, but we do not think it necessary to engage in such a review. We regard our ruling in Myers v. Vanderbelt as obliterating the distinction between writings in ink and pencil, and assigning precisely the same legal effect to the instrument in either case. If there be no distinction between these methods of writing, so far as their legal effect is concerned, we can see no reason for assigning an effect to a pencil alteration different from that which we would assign to an alteration in ink. If we do that, we say they are not the same, whereas we have deliberately decided they are the same, not only in relation to wills, but to other solemn instruments, as was shown in the opinion in Myers v. Vanderbelt. We do not care to repeat the reasoning and authorities of that opinion, because we deem it entirely unnecessary. It would certainly be inconsistent to hold that in alterations of wills pencil writing and ink writing have not the same effect, when in all other cases we say they have. As indicative of the testator's intent, the pencil alterations speak quite as certainly as if they were in ink. The will was found after the testator's death, locked up in a drawer in his own room. He chose to leave it in the exact condition in which it was found. As it was found, it clearly canceled certain of the legacies. By what authority can we say that they were not canceled, when in point of fact they were? How can we say it was not the intention of the testator to make these cancellations, when in reality he has made them? Do they not signify the same intent being in pencil that they would have signified being in ink? We have no right to say they do not, and, that being so, they prevail alike, whether in ink or pencil.

It is argued that the will was found among papers of no value, and therefore we must infer the alterations were deliber-

ative only; but that objection would apply as well to the will itself as to the alterations. If it was found in a place of sufficiently careful custody to sustain it as a will, that custody was equally sufficient to sustain the alterations. Moreover, if sustained at all, it must be only in the condition in which it is found. But the argument upon this ground has no merit. The will was found locked up in a drawer in a bureau, standing in the testator's room in which he lay sick and died. The keys, one of which unlocked the drawer, were delivered by the testator shortly before his death to Miss Cressman, a relative and his nurse, with direction to hand them to Mr. Dutton, one of the executors, as soon as he was dead. To hold that such a custody was a careless custody, sufficient to raise even a doubt about the intention of the testator in regard to its contents, is simply impossible.

Another circumstance, to which the court attached consequence, was that a paper was found in the testator's box at bank which contained a list of the legatees as they were named in the will, and with all of the legacies canceled in pencil that were so canceled in the will, except one, John Keller, whose name was canceled, but not the amount, $500. The court thought this was proof that the testator was still vacillating, (in 1883 or 1887,) because John Keller's name and legacy were not canceled in the will, and therefore that all the cancellations should be regarded as deliberative only. We cannot consider this circumstance as having such a meaning. To us it is indicative rather that the paper found in the bank was probably his first or deliberative memorandum, which he made final when he made the cancellations in the will, and there he concluded to let Keller's legacy remain. We find no other facts in the case indicating that the testator did not intend to do that which in fact he did do, and hence we are of opinion that the view of the whole subject taken by the learned auditor was the correct view, and that it was error to overrule his report.

The decree of the Orphans' Court is reversed, at the cost of the appellees, and the record is remitted, with instructions to distribute the fund in accordance with the report of the auditor.